# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70030

United States Court of Appeals
Fifth Circuit

**FILED**
August 8, 2014

Lyle W. Cayce
Clerk

ARTHUR BROWN, JR.,

Petitioner – Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent – Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and JOLLY and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Texas death row inmate Arthur Brown, Jr., has exhausted all state and federal habeas appeals. He has, however, filed a Texas state petition for clemency and his execution has been stayed by the Texas courts. He moved the federal district court to allow funds to hire a mitigation specialist to assist him in his state clemency proceedings. Although Brown requested $7,500 in his motion, his mitigation specialist estimated the investigation would cost $20,000. The district court turned him down. He now appeals the district court's denial of his motion. We find no abuse of discretion in denying the funding and AFFIRM the order of the district court denying Brown's motion.

No. 13-70030

I.

Brown was convicted of capital murder for his role in the murders of four people. We described the crime in our previous opinion as follows:

> Rachel Tovar and her husband, Jose, were drug dealers in Houston, Texas. They supplied marijuana and cocaine to other drug dealers, including Brown and his associates, who were from Tuscaloosa, Alabama. On June 19, 1992, Brown traveled from Tuscaloosa to Houston, accompanied by Marion Dudley, Antonio Dunson, and Maliek Travis. They arrived at the Houston residence of Brown's sister, Grace, early in the morning on June 20.
>
> That evening, six people were bound and shot in the head at Rachel Tovar's residence in Houston. Four of them died: Jessica Quinones, the pregnant common-law wife of Rachel Tovar's son, Anthony; Jose Guadalupe Tovar, Rachel Tovar's husband; Audrey Brown, one of Rachel Tovar's neighbors; and Frank Farias, Rachel Tovar's son. Rachel Tovar and Alexander Camarillo, also known as Nicolas Cortez Anzures, survived and testified at Brown's trial. Both of them identified Brown and Dudley, whom Tovar knew, from previous drug deals, by the nicknames of "Squirt" and "Red," as the shooters. Three of Brown's sisters—Serisa Ann Brown, Grace Brown, and Carolyn Momoh—testified as witnesses for the State at the guilt-innocence phase. All three of them claimed that the police and prosecutors had threatened them in order to coerce their cooperation. Carolyn Momoh was held in contempt and incarcerated at one point during the trial for invoking the Fifth Amendment, despite the fact that she had been given immunity. After she eventually testified, she was convicted of perjury. The jury convicted Brown of capital murder.

*Brown v. Thaler*, 684 F.3d 482, 486 (5th Cir. 2012) (footnote omitted).

At the punishment phase, the State presented evidence that Brown had committed an armed robbery four years earlier, that he had extorted other prisoners while in jail awaiting trial, and that he had assaulted a deputy at the jail. Brown's counsel presented evidence that he had a low IQ, suffered from learning disabilities, and did not do well in special education classes. They also presented the testimony of a law professor that prisoners become

2

less violent as they get older. Trial counsel's cross-examination of Brown's sister, Serisa Ann Brown, during the guilt-innocence phase of the trial also resulted in the presentation of some mitigating evidence. She testified that Brown had 32 brothers and sisters, that Brown's mother was present in the courtroom during the trial, that Brown was only 23 years old, that Brown had three children, and that Brown was close to the mother of his three children.

In the state habeas proceedings, Brown's counsel obtained $2,500 from the Texas Court of Criminal Appeals (TCCA) for a mitigation specialist. The mitigation specialist, Lisa Milstein, traveled to Tuscaloosa, Alabama, where she interviewed Brown's parents, his brother, and his three sisters. She obtained an affidavit from Brown's mother in which she stated that she drank alcohol excessively during her pregnancy with Brown. Brown's state habeas counsel sought an additional $2,700 for Milstein to complete her investigation. That request was supported by Milstein's statement in which she outlined the evidence she had discovered and described the evidence she wanted to develop through additional investigation. The state court denied the additional funding request.

In his state habeas application, Brown claimed that trial counsel rendered ineffective assistance in the investigation and presentation of mitigating evidence. As support for his claim, Brown relied on the affidavit of his mother, in which she described her drinking while she was pregnant with him, and the affidavit of mitigation specialist Milstein, describing her investigation into Brown's background. We described the contents of Milstein's affidavit in our previous opinion, as follows:

> Milstein stated that Brown's mother, Joe Mae Brown, . . . told Milstein that when Brown was three years old, he fell from a swing and struck his head on a cement porch. Mrs. Brown took him to a hospital, where the attending physician determined that he had a concussion. Milstein stated that Mrs. Brown told her that Brown

had headaches two to three times a week for several months after the concussion, but they never took him for a follow-up visit with the doctor. Mrs. Brown also told Milstein that she was married to Brown's father when Brown was born, but that they divorced when he was twelve years old; that during the marriage, Brown's father beat her; that Brown was close to his father, and she started having problems with Brown after the divorce; and that Brown threatened to commit suicide by jumping out of a window at his school.

According to Milstein, she did not learn of Brown's mother's history of alcohol abuse while interviewing Mrs. Brown, but learned of it later from interviews with other family members. Milstein stated that Brown's sister, Serisa, told her that Mrs. Brown often went out drinking at night, leaving the children alone at home, and returning heavily intoxicated in the early morning. Sometimes when she returned home she woke the children and made them pray throughout the rest of the night. As a result, the children were frequently tired at school. According to Milstein, Grace Brown, another of Brown's sisters, stated that Brown was exposed to his mother's drinking as a child and was embarrassed by her appearance in public while drunk. Milstein said that Grace also told her that after the divorce, their mother's drinking friends came around more often.

Milstein stated that when she confronted Mrs. Brown, Mrs. Brown admitted that she drank on a daily, or near daily, basis; that she drank heavily throughout her pregnancy with Brown; and that she obtained homemade bootleg whiskey from one of her sisters. Milstein believed that Mrs. Brown was likely an alcoholic. In her handwritten affidavit, Mrs. Brown stated that she drank while pregnant with Brown, at least every weekend and often during the week. She estimated that she consumed at least a pint of bootleg whiskey or brandy. Milstein believed that Mrs. Brown's alcohol abuse during her pregnancy with Brown was an important mitigating fact, because it might have caused organic brain damage called Fetal Alcohol Syndrome or Fetal Alcohol Effect.

Milstein reported that she learned from her investigation that Brown had an impoverished upbringing. After his parents' divorce, he lived with his mother and three other siblings in a small apartment in a poor area of Tuscaloosa, in a neighborhood that contained drugs and violence. According to Milstein, Brown's

4

childhood was one marked by deprivation, including lack of food, clothing, guidance, and a father figure. Brown was devastated by his parents' divorce and was left in the hands of a drunken and abusive mother.

Milstein stated that Brown had a stable relationship in Tuscaloosa with his common-law wife and that he worked at legitimate jobs to provide for her and their three children. Milstein stated that Brown's sister Grace told her that Brown had an intense work ethic and had on occasion worked two jobs at once to support his family. Milstein reported that each of Brown's sisters told her that Brown's trial counsel did not ask them any questions regarding mitigating evidence.

684 F.3d at 493–94.

The TCCA denied Brown's state habeas application. *Ex parte Brown*, No. WR-26178-02, 2008 WL 2487788 (Tex. Crim. App. June 18, 2008) (unpublished).

In his federal habeas petition, Brown claimed that the state courts violated his constitutional rights by failing to provide additional funds and that trial counsel rendered ineffective assistance by not putting the contents of the two affidavits into evidence at trial. The district court held that the state habeas court's decision to deny the ineffective assistance claim was not contrary to, or an unreasonable application of, federal law. *Brown v. Thaler*, No. H-09-74, 2011 WL 798391 (S.D. Tex. Feb. 28, 2011) (unpublished). The district court stated that there was not a reasonable probability that the jury would have made a different assessment of Brown's moral culpability had his trial counsel presented the evidence that Brown claimed should have been presented, as described in the affidavits of Milstein and his mother. It denied habeas relief and denied a certificate of appealability (COA).

Brown requested a COA from this court for his claim that his trial counsel rendered ineffective assistance by failing to investigate available mitigating evidence concerning his difficult childhood and troubled

No. 13-70030

background, including his mother's alcohol abuse, by failing to retain mental health experts to evaluate his low intelligence, and by failing to explore whether he suffers from Fetal Alcohol Spectrum Disorder. This court denied Brown's request for a COA. 684 F.3d 482. The Supreme Court denied certiorari. *Brown v. Thaler*, 133 S. Ct. 1244 (2013).

After Brown's execution was scheduled, he filed in the district court an ex parte motion for authorization of funding and for appointment of a mitigation investigator to assist in clemency proceedings. He asked the district court to appoint Nicole VanToorn, a mitigation specialist, at an estimated cost of $20,000, to complete the investigation that Milstein started in the state habeas proceedings. He sought to develop a complete life and social history, including evidence of poverty, family violence, exposure to drugs and alcohol during childhood, and brain impairments caused by his mother's excessive drinking during her pregnancy with him. The district court denied Brown's request for funds, holding that he had not shown that the proposed investigation is reasonably necessary for the purposes of clemency.

Brown filed a clemency petition on October 7, 2013. The State withdrew the execution date in order to allow Brown to seek retesting of certain trial evidence, and Brown withdrew the clemency petition. This appeal is not moot, however, because of the likelihood that the State will reschedule Brown's execution.

## II.

Brown argues that the district court abused its discretion in denying funds for a mitigation specialist. He contends that the court mischaracterized his proposed investigation as a request to obtain affidavits from the witnesses Milstein had previously identified and interviewed. Instead, he maintains that his proposed investigation was designed to follow up on the leads that Milstein had uncovered and to obtain first-hand witness accounts concerning his

upbringing and family history. He asserts that Milstein's affidavit indicates that there are numerous red flags that more important mitigating evidence exists and should be developed and presented in clemency proceedings, and that it is unfair to limit him to the evidence that Milstein uncovered in 1998, because her investigation was incomplete and does not accurately and fully portray his upbringing and family history. Brown contends further that the district court substituted its judgment concerning Brown's entitlement to clemency for that of the Parole Board and Governor. He points out that the Board may consider defects in the justice system, as well as questions of mercy and moral culpability, untethered by the legal standards applicable in prior judicial proceedings.

We review the denial of funding for investigative or expert assistance for an abuse of discretion. *Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009); *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005). In *Harbison v. Bell*, 556 U.S. 180, 183 (2009), the Supreme Court held that 18 U.S.C. § 3599 authorizes federally funded counsel appointed to represent an indigent state prisoner in federal habeas proceedings to represent him in subsequent state clemency proceedings.

Section 3599 provides further that

Upon a finding that investigative, expert, or other services are *reasonably necessary* for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g).

18 U.S.C. § 3599(f) (emphasis added). Subsection (g) provides that

Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under subsection (f) shall not exceed $7,500 in any case, unless payment in excess of that limit is certified by the court . . . as necessary to provide fair

compensation for services of an unusual character or duration, and
the amount of the excess payment is approved by the chief judge
of the circuit.

18 U.S.C. § 3599(g)(2).

In addressing requests for funding for expert or investigative assistance
in federal habeas proceedings, this court has interpreted "reasonably
necessary" to mean that the petitioner must show that he has "a substantial
need" for the requested assistance. *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir.
2004). In the federal habeas context, we have held that a district court may
deny an inmate's request for funds "when a petitioner has (a) failed to
supplement his funding request with a viable constitutional claim that is not
procedurally barred, or (b) when the sought-after assistance would only
support a meritless claim, or (c) when the sought after assistance would only
supplement prior evidence." *Smith*, 422 F.3d at 288 (citations omitted)
(addressing request for funds to obtain the assistance of an expert psychologist
in federal habeas proceedings).

The district court noted that questions about the procedural adequacy of
a claim have no bearing on the clemency process, but it nevertheless concluded
that an inquiry into the merits of the proposed investigation still applies to
requests for funds to support clemency. Therefore, it held that Brown was
required to show that the proposed investigation would not just supplement
prior evidence or support meritless claims. The district court held that Brown
had not shown that federal funds for a mitigation investigation, especially one
as expensive as the one he proposed, were reasonably necessary for the
purposes of clemency. Although Brown requested only $7,500 in his motion,
his mitigation specialist estimated that the investigation would cost $20,000.
The court pointed out that the estimated cost of the investigation was nearly
three times the statutory limit of $7,500 and that, for funds over that limit,

No. 13-70030

Brown must show that the requested assistance is of "unusual character or duration." 18 U.S.C. § 3599(g)(2). The court found that Brown had not shown what mitigating evidence remains undiscovered and that he only sought to amass more, not fundamentally different, mitigation evidence. The court stated that, other than interviewing more witnesses, Brown had not shown what information was missed by Milstein. Further, he did not propose any mitigation theory that exceeded the contours of the affidavits he presented on federal habeas review and his request for investigative assistance followed the same mitigating avenues outlined in Milstein's and his mother's affidavits. The court concluded that it was speculative whether additional investigation would uncover information different from that contained in Milstein's report. The court concluded that federal courts have no obligation to authorize fishing expeditions and that federal law does not authorize funding for speculative investigation in the hopes that Brown may turn up something new.

Our court has not addressed a request for funding for investigative services in the clemency context. In determining whether such services are "reasonably necessary," consideration must be given to the nature and purpose of clemency proceedings. The clemency process takes place only after all judicial proceedings have been completed. In capital cases, such judicial proceedings include, at a minimum, trial, direct appeal, state post-conviction review, and federal habeas review, in all of which proceedings indigent prisoners are provided with legal representation and investigative and expert assistance at taxpayer expense. Clemency "proceedings are a matter of grace entirely distinct from judicial proceedings." *Harbison*, 556 U.S. at 192. "Clemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Herrera v. Collins*, 506 U.S. 390, 411–12 (1993) (footnote omitted). Thus, when a petitioner requests funds for investigative services for

9

the purpose of clemency proceedings, the petitioner must show that the requested services are reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice. Accordingly, it was appropriate for the district court to consider the merits of the proposed investigation and to consider whether the proposed investigation would only supplement prior evidence that had already been considered in the judicial proceedings and was thus available to the Board and the Governor.

We hold that the district court did not abuse its discretion in denying Brown's request for funds. Brown sought funds for the purpose of completing the investigation commenced by Milstein in the state habeas proceedings, to develop evidence of poverty, family violence, exposure to drugs and alcohol during childhood, and brain impairments caused by his mother's excessive consumption of alcohol during her pregnancy. Although Milstein estimated that she could complete her investigation in 54 hours, Brown requested authorization for nearly four times that number of hours for the proposed investigation by VanToorn. As the district court observed, there can be little doubt but that the facts of Brown's crime will weigh heavily in his clemency proceedings. Those facts are brutal: Brown and his accomplices bound and shot six people in the head, execution-style. Although two of the victims survived, one of the four who died was a nearly nine-months pregnant teenager. In his request for funds, Brown offered little beyond speculation that the proposed additional investigation would uncover some information different from that Milstein described in her report and affidavit. Brown failed to demonstrate that the proposed investigation by VanToorn was reasonably necessary to provide the Board of Pardons and Paroles and the Governor with material information beyond that already adduced by Milstein. Accordingly,

the district court did not abuse its discretion by denying funding for such investigation.

## III.

Brown has not demonstrated that the funds he requested for investigative services are reasonably necessary for clemency proceedings. Accordingly, the district court did not abuse its discretion by denying the requested funds.  The order of the district court is therefore

AFFIRMED.