# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-70033
Cons. w/ No. 16-70002

United States Court of Appeals
Fifth Circuit

**FILED**
August 10, 2016

Lyle W. Cayce
Clerk

CHRISTOPHER CHUBASCO WILKINS,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, DAVIS, and PRADO, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The State of Texas sentenced Petitioner-Appellant Christopher Chubasco Wilkins to death for the murders of Willie Freeman and Mike Silva. Having unsuccessfully pursued federal habeas corpus relief, Wilkins now requests investigative and expert funding to support a state clemency petition and a successive state habeas petition.

The district court denied Wilkins's motion for funding. The district court also denied Wilkins's attorney compensation for her work on Wilkins's case.

No. 15-70033 Cons. w/ No. 16-70002

For the reasons discussed below, we affirm the district court's order denying Wilkins's motion for investigative and expert funding. However, we vacate the district court's order denying Wilkins's counsel compensation and remand for further proceedings consistent with this opinion.

I.

A.

A jury found Wilkins guilty of capital murder. The facts of Wilkins's crime are set forth in our prior opinion in this case.[1]

After unsuccessfully pursuing relief in state court, Wilkins sought habeas corpus relief in federal district court. Wilkins also asked the district court for funding for investigative and expert services to support his federal habeas petition. Specifically, Wilkins requested "nearly $92,000 in funding to pay for a fact investigator, a mitigation specialist, a neuropsychologist, and a prison expert to help develop his claims for relief."[2]

The district court denied Wilkins's federal habeas petition. The court also denied Wilkins's motion for investigative and expert funding.

Wilkins sought a certificate of appealability ("COA") from this Court. Wilkins also appealed the district court's order denying his motion for funding. We appointed Hilary Sheard to represent Wilkins in connection with his appeal.

We ultimately denied Wilkins's COA petition.[3] We further ruled that the district court did not abuse its discretion by denying Wilkins's motion for expert and investigative funding.[4]

---

[1] *See Wilkins v. Stephens*, 560 F. App'x 299, 301-02 (5th Cir. 2014) (per curiam).
[2] *Id.* at 302.
[3] *Id.* at 303-15.
[4] *Id.* at 315.

No. 15-70033 Cons. w/ No. 16-70002

B.

Having failed to obtain federal habeas relief, Wilkins asked the district court for investigative and expert funding to support a state clemency petition and a successive state habeas petition. Wilkins seeks funding to hire the following investigators and experts:

| | |
|---|---|
| Fact Investigator: | $10,500 |
| Mitigation Specialist: | $15,000 |
| Neuropsychologist: | $12,000 |
| Prison Expert: | $1,000 |
| GRAND TOTAL: | $38,500 |

The district court denied Wilkins's motion. Wilkins now appeals.

C.

After Wilkins filed his notice of appeal, Sheard sought compensation from the district court "for work performed in both the district court and in state court since the State announced its intention, in June 2015, to seek an execution date."[5] Sheard accordingly submitted two Criminal Justice Act ("CJA") vouchers to the district court – one for compensation for work performed in the federal district court, and another for work performed in state court.

The district court denied payment on both vouchers. The district court concluded that our order appointing Sheard to represent Wilkins on appeal did not authorize her to represent Wilkins in subsequent federal or state proceedings. The district court therefore concluded that it had no "obligation

---

[5] Specifically, Sheard sought payment for legal services rendered in connection with (1) the instant motion for federal funding for investigative and expert services; (2) a state court motion for appointment of a DNA/toolmark expert; (3) a state court motion for retention of juror information; (4) a hearing in state court to set an execution date; and (5) a federal court motion to stay Wilkins's execution.

No. 15-70033 Cons. w/ No. 16-70002

to pay Sheard for any legal work or expenses incurred by her in her representation of Wilkins."

Sheard now appeals the district court's order denying payment on her two CJA vouchers. We have consolidated the two appeals.

II.

We first address whether the district court erred by denying Wilkins's motion for investigative and expert funding to support Wilkins's state clemency petition.[6]

A.

"We review the denial of funding for investigative or expert assistance for an abuse of discretion."[7] "[A] COA is not necessary to appeal the denial of funds for expert assistance" or investigative services.[8]

B.

18 U.S.C. § 3599 authorizes federal funding for indigent petitioners charged with a crime punishable by death. "Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant," the district court "may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor."[9]

---

[6] We reject the State of Texas's argument that we lack appellate jurisdiction to decide this issue. *See Brown v. Stephens*, 762 F.3d 454, 458-59 (5th Cir. 2014) (rejecting identical argument).

[7] *Id.* at 459 (citing *Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009); *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005)).

[8] *Smith*, 422 F.3d at 288 (citing *Hill v. Johnson*, 210 F.3d 481, 487 n.3 (5th Cir. 2000)).

[9] 18 U.S.C. § 3599(f).

No. 15-70033 Cons. w/ No. 16-70002

As relevant here, the district court may, in the exercise of its sound discretion, authorize federal funding for investigative and expert services in subsequent state clemency proceedings.[10]

> [W]hen a petitioner requests funds for investigative services for the purpose of clemency proceedings, the petitioner must show that the requested services are reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice.[11]

If "the proposed investigation" or expert testimony "would only supplement prior evidence that had already been considered in the judicial proceedings" preceding the clemency petition, it is generally not an abuse of discretion to deny funding because the requested investigative and expert services would not "provide the Board of Pardons and Paroles and the Governor with material information beyond that already adduced."[12] The district court may also consider "the merits of the proposed investigation" when deciding whether to grant or deny funding.[13]

## C.

For the following reasons, we conclude that the district court did not abuse its discretion by denying Wilkins's motion for funding. We shall discuss each category of funding requested by Wilkins in turn.

---

"Fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under" 18 U.S.C. § 3599(f) are ordinarily limited to $7,500. *Id.* § 3599(g)(2). Fees and expenses may exceed $7,500 only if "payment in excess of that limit is certified by the court," the payment is "necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit." *Id.*

[10] *See Brown*, 762 F.3d at 459-61.

[11] *Id.* at 460.

[12] *Id.* at 460-61.

[13] *Id.* at 460.

No. 15-70033 Cons. w/ No. 16-70002

1.

Wilkins first requests funding for further investigation into his background and social history. He claims that he must "interview[] both family members and also non-family members such as neighbors, teachers, case workers, doctors, correctional, probation or parole officers" in order to compile a "full and accurate family and social history that was not created during the trial or state habeas corpus proceedings." Wilkins's proposed investigation "would include areas such as [his] substance abuse and head traumas – matters relevant to his mental health – and the apparent failure of the Texas Youth Commission to provide him with needed services when he was incarcerated in his teens."

The district court was entitled to conclude that the proposed investigation into Wilkins's background and social history "would only supplement prior evidence that had already been considered in the judicial proceedings."[14] First, to the extent Wilkins seeks funds to investigate his problems with substance abuse, any evidence the investigator uncovered would likely be cumulative of evidence introduced at trial. Several of Wilkins's family members testified at the sentencing phase that Wilkins struggled with substance abuse. The jury heard testimony from multiple witnesses that, although Wilkins was considerate, protective of his family, and hard-working before he became involved with drugs, his drug use "destroyed his life" and transformed him into a "very mean" person.

Likewise, the defense called five of Wilkins's family members to testify regarding Wilkins's turbulent childhood and social history. Wilkins's mother testified that Wilkins was a product of divorce, and that she became remarried multiple times during Wilkins's youth. Wilkins's often-absent biological father,

---

[14] *See id.*

who frequently failed to pay child support and had serious drug problems and a lengthy criminal history of his own, once committed automobile theft and tried to get Wilkins to "take responsibility for the stolen car because he was a minor and the penalty would be less significant." The jury also heard testimony that, during Wilkins's teenage years, he was involved in a serious motorcycle accident which left him critically injured and claimed the life of one of his friends. Thus, the district court was entitled to conclude that any information regarding Wilkins's background and social history which might be uncovered during the course of his proposed investigation would likely be cumulative of evidence introduced at trial.

2.

Wilkins confessed not only to the capital crimes for which he was convicted, but also to additional murders and other offenses. The State introduced evidence of Wilkins's multiple confessions at trial.[15]

Wilkins insists, however, that at least some his confessions were false. He claims he has a "known propensity to make false, but damaging, admissions." He therefore argues that "the evidence supposedly corroborating his confessions need[s] to be investigated, with that work including eyewitness interviews and examination and evaluation of the physical and forensic evidence."

The district court did not abuse its discretion by denying funding to investigate the veracity of Wilkins's numerous confessions. As the Texas Court of Criminal Appeals explained in its opinion affirming Wilkins's conviction on

---

[15] *See Wilkins v. State*, No. AP-75878, 2010 WL 4117677, at *2 (Tex. Crim. App. Oct. 20, 2010) ("The trial court permitted [Detective Cheryl] Johnson to testify on cross-examination that [Wilkins] had also claimed responsibility for several murders and other offenses in a variety of states.").

direct appeal, the State introduced crime scene photographs which "corroborated details of [Wilkins's] confession with respect to the manner of killing the victims and disposing of their bodies. The photographs therefore rebutted the defensive theory that [Wilkins] gave a false confession."[16] Moreover, Wilkins does not argue that his confessions were coerced; he merely claims he has a tendency to make "self-defeating choices." The district court could therefore reasonably conclude that further investigation into the facts underlying Wilkins's confessions would be fruitless.

3.

At sentencing, the prosecution introduced evidence that Wilkins murdered an additional victim named Gilbert Vallejo.[17] Wilkins claims that "several known alternative suspects for the murder of Gilbert Vallejo need[] to be investigated."

The district court was entitled to conclude this investigation would also be fruitless. Wilkins confessed to Vallejo's murder,[18] and, as explained above, Wilkins does not argue that this confession was coerced. Thus, any investigation into alternative suspects for Vallejo's murder would probably not uncover any exculpatory evidence which could support Wilkins's clemency petition.

4.

Wilkins next claims that:

Witnesses who merited further investigation included a convicted prostitute who may have been under the influence of alcohol at the time of her testimony and a witness who had recently received the

---

[16] *Id.* at *5.

[17] *Id.* at *2.

[18] *Id.*

minimum sentence for a felony in another county and was released just over a month before he testified at trial.

Wilkins therefore requests funding to investigate these two witnesses.

Wilkins does not explain why further investigation of these witnesses might uncover evidence which could support his clemency petition. This argument is therefore meritless.

5.

Wilkins next requests funding to investigate allegations that his trial attorney and his state habeas attorney labored under conflicts of interest. For the reasons we explain below, the district court did not err by denying Wilkins's request.

a.

As noted above, Wilkins confessed to murdering Gilbert Vallejo.[19] Wilkins's trial counsel, Wes Ball, represented Vallejo in an unrelated probation revocation proceeding twenty years before representing Wilkins.[20] Wilkins requests funds to investigate any alleged conflict of interest resulting from Ball's prior representation of Vallejo.

We have already considered and rejected Wilkins's claim that Ball's prior representation of Vallejo created a conflict of interest.[21] As we explained when denying Wilkins a petition for COA, Ball's "representation of Vallejo had been unequivocally terminated; the facts and issues of the prior representation had no relation to Ball's representation of Wilkins. No evidence was produced by

---

[19] *Id.*

[20] *Wilkins v. Stephens*, 560 F. App'x at 309.

[21] *Id.* at 308-10.

No. 15-70033 Cons. w/ No. 16-70002

Wilkins to show that Ball even remembered representing Vallejo."[22] It is clear that further investigation of this issue would be fruitless and would serve no purpose other than to rehash claims which this Court already considered and rejected.

b.

Wilkins also complains that his state habeas counsel, Jack Strickland, accepted a job with the District Attorney's office that had prosecuted Wilkins shortly before Strickland filed Wilkins's state habeas petition. Wilkins therefore requests funds to investigate Strickland's connections to the District Attorney's office.

Once again, we have already considered and rejected Wilkins's argument that Strickland labored under a conflict of interest.[23] In our opinion denying Wilkins's COA petition, we emphasized that "Strickland never missed a filing deadline and filed a lengthy petition which raised eighteen points of error on Wilkins's behalf. The record reflects that Strickland actively represented" Wilkins and "did not abandon his client."[24]

Thus, granting funds to investigate Strickland's connections to the District Attorney's office would serve little purpose other than to rehash arguments this Court has already rejected. The district court therefore did not abuse its discretion by declining to do so.

---

[22] *Id.* at 309.

[23] *Id.* at 304.

[24] *Id.*

10

6.

Next, Wilkins seeks funds to interview trial jurors "with regard to the possibility of ineffective assistance during jury selection, jury misconduct, and whether the security measures employed at trial were obvious to the jury."

Wilkins offers no explanation regarding how trial counsel rendered ineffective assistance during jury selection. Nor does Wilkins explain how interviewing jurors regarding that issue could conceivably produce evidence to support his clemency petition. The district court therefore did not abuse its discretion by denying funding to explore this entirely speculative avenue.

Nor does Wilkins identify the basis for his speculation that the jury engaged in misconduct. We therefore reject this argument as well.

Nor did the district court abuse its discretion by declining to allocate funds to investigate whether the security measures employed at trial were obvious to the jury. Wilkins previously argued in his COA petition that "there was an excessive number of guards in close proximity to him while he testified at the sentencing phase, and that the use of a taser belt as a restraint with a guard holding the remote nearby and visible to the jury impaired his defense."[25] We rejected that argument:

> The record in the instant case makes clear that Wilkins had attempted escape multiple times: he broke both ankles after falling thirty feet from the outer wall of a prison basketball court; at one point, he was discovered to have swallowed a handcuff key; one of the key events which led to his encounter with murder victims Freeman and Silva was an escape from a Texas halfway house. The record also indicates a history and propensity for violence. We therefore conclude that . . . the trial court was well within its discretion to impose increased security measures during the penalty phase given Wilkins's personal history . . .[26]

---

[25] *Id*. at 314.
[26] *Id*.

11

It is purely speculative whether any of the jurors knew Wilkins was wearing a concealed taser belt,[27] and, if so, whether that fact would have mattered to any of the jurors. The district court therefore did not abuse its discretion by denying funding to interview the jurors regarding this issue.

7.

Wilkins next seeks to hire a neuropsychologist to perform "[a] full neuropsychological evaluation . . . in light of [his] past head injuries, identified cognitive deficits and risk factors for brain damage." Wilkins claims that even though his trial counsel hired a psychologist to evaluate his mental functioning and develop a mitigation case, trial counsel did not pursue that psychologist's recommendation to conduct a full neuropsychological examination.

The district court did not abuse its discretion by denying this funding request either. Wilkins previously requested expert funding to hire a neuropsychologist when he filed his federal habeas petition.[28] The district court concluded that "that the funding was not 'reasonably necessary,'"[29] and we agreed.[30] Thus, the district court could once again reasonably conclude that the requested funding was not "reasonably necessary" for Wilkins's clemency petition, just as it was not reasonably necessary for his federal habeas petition.

8.

Although Wilkins hired a prison expert to testify on his behalf at trial, Wilkins now claims that this expert "inaccurately and prejudicially" testified during sentencing that Wilkins could achieve a less restrictive prison security

---

[27] As we stated in our previous opinion in this case, "the record does not demonstrate that the presence of the taser belt was open and obvious to the jury." *Id.*

[28] *Id.* at 302.

[29] *Id.*

[30] *Id.* at 315.

No. 15-70033 Cons. w/ No. 16-70002

status after ten years. In actuality, claims Wilkins, the Texas Department of Corrections had recently made its security policies more restrictive to reduce the likelihood that inmates like Wilkins could successfully escape. Wilkins therefore requests funds to hire a second "prison classification and conditions expert" to "review the testimony of the defense 'expert' at trial, . . . review Mr. Wilkins' incarceration records and assess the likely security conditions to which he be [sic] subject if serving a life sentence."

The district court did not abuse its discretion by denying Wilkins's request to hire a second prison expert. Wilkins previously sought federal funding to hire an additional prison expert, the district court concluded "that the funding was not 'reasonably necessary,'" and we affirmed.[31] Wilkins is therefore attempting to relitigate an issue he has already lost.

9.

In sum, the district court was entitled to conclude that none of the requested funds are reasonably necessary for the preparation of Wilkins's clemency petition. Consequently, the court did not abuse its discretion by denying Wilkins's motion for expert and investigative funding.

III.

In addition to his plan to file a state clemency application, Wilkins also plans to file a successive state habeas petition which would raise the following claims:

- A claim that his "former counsel failed to plead specific facts, which, if proven true, might call for relief;"[32]

---

[31] *Id.*

[32] *See Ex Parte Medina*, 361 S.W.3d 633, 642-43 (Tex. Crim. App. 2011).

13

No. 15-70033 Cons. w/ No. 16-70002

- "[A] subsequent Application urging reconsideration of *Ex Parte Graves*;"[33] and

- A claim that habeas counsel did not have Wilkins's informed consent to file his habeas petition, which was filed "without [his] permission and against [his] will."[34]

Wilkins therefore asked the district court for expert and investigative funding to support his proposed successive state habeas petition. The district court denied Wilkins's request.

Neither Wilkins's appellate briefs nor the brief he filed in the district court explain why investigative or expert funding is necessary to develop the arguments he intends to raise in his successive state habeas petition. As a result, we cannot conclude that the district court abused its discretion by denying the requested funds.[35]

IV.

We next consider whether the district court erred by denying payment on Sheard's CJA vouchers for work she performed on Wilkins's behalf in state and federal court.

A.

As noted above, this Court appointed Sheard to represent Wilkins on appeal. After that appeal concluded, Sheard continued to represent Wilkins in subsequent federal and state proceedings.[36] Sheard thereafter submitted two

---

[33] *See Ex Parte Graves*, 70 S.W.3d 103, 105 (Tex. Crim. App. 2002).

[34] *See Ex Parte Gallo*, 448 S.W.3d 1, 2 (Tex. Crim. App. 2014).

[35] Wilkins also wishes to file a FED. R. CIV. P. 60(b) motion based on *Ruiz v. Quarterman*, 504 F.3d 523, 532 (5th Cir. 2007) in the event the state court denies his successive habeas petition. Wilkins does not explain why investigative or expert funding is necessary to develop this argument either.

[36] Among other legal services rendered on Wilkins's behalf, Sheard (1) filed the instant motion for federal funding for investigative and expert services; (2) filed a state court motion

No. 15-70033 Cons. w/ No. 16-70002

CJA vouchers to the district court requesting compensation for services rendered on Wilkins's behalf. The district court concluded that the subsequent proceedings in the district and state courts exceeded the scope of Sheard's appointment, so it denied Sheard's requests for compensation in their entirety.

On appeal, Sheard argues that, once this Court appointed her to represent Wilkins, she was authorized – and, indeed, obligated – to continue representing him in subsequent federal and state proceedings until relieved by court order. She argues that she was not required to seek reappointment by the district court after we appointed her as counsel. Thus, argues Sheard, she is potentially entitled to compensation for her work in the federal and state courts.

We agree with Sheard. This Court appointed Sheard to represent Wilkins pursuant to 18 U.S.C. § 3599. Once a court appoints an attorney under § 3599, that attorney "*shall represent the defendant* throughout *every subsequent stage of available judicial proceedings*" unless that attorney is "replaced by similarly qualified counsel."[37] Appointed counsel must represent the defendant throughout "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures," as well as "competency proceedings and proceedings for executive or other clemency."[38]

Nothing in the text of § 3599(e) requires counsel to reapply for reappointment in the district court after the appeal concludes. Thus, generally speaking, when this Court appoints an attorney to represent a capital

---

for appointment of a DNA/toolmark expert; (3) filed a state court motion for retention of juror information; (4) participated in a hearing in state court to set an execution date; and (5) filed a federal court motion to stay Wilkins's execution.

[37] 18 U.S.C. § 3599(e) (emphasis added).

[38] *Id.*

The Supreme Court has interpreted this provision to apply to subsequent state and federal proceedings alike. *Harbison v. Bell*, 556 U.S. 180, 188 (2009).

15

defendant, our order automatically authorizes that attorney to represent the defendant in other subsequent post-conviction proceedings as well.[39]

Our recent decision in *Battaglia v. Stephens*[40] further supports Sheard's argument. In that case, as in the instant case, we appointed an attorney to represent a capital defendant on appeal.[41] After the appeal concluded, appointed counsel refused to pursue state competency proceedings on the petitioner's behalf because the attorney "believe[d] that his representation d[id] not extend to state competency proceedings."[42] We disagreed. We explained that, "[u]nder § 3599(e), a lawyer appointed to represent a capital defendant *is obligated to continue representing his client until a court of competent jurisdiction grants a motion to withdraw*."[43] We therefore ruled that, by refusing to represent the defendant in state competency proceedings, the attorney had "abandoned" his client, and the district court therefore "erred in declining to appoint new counsel under § 3599."[44] *Battaglia* therefore demonstrates that counsel need not return to the district court for reauthorization before representing a capital defendant in post-appeal proceedings; counsel is authorized – and indeed obligated – to continue representing the defendant until the court permits him to withdraw.

---

[39] There are exceptions to the general rule that appointed counsel must continue representing the defendant in subsequent proceedings, but none are applicable here. *See, e.g.*, *Harbison*, 556 U.S. at 189 (explaining that "when a state prisoner is granted a new trial following § 2254 proceedings, his state-furnished representation renders him ineligible for § 3599 counsel until the commencement of new § 2254 proceedings"); *Irick v. Bell*, 636 F.3d 289, 290-93 (6th Cir. 2011) (holding that § 3599 did not authorize federally-funded counsel to represent death-row prisoner in state competency proceedings because prisoner had a statutory right under state law to state-funded counsel).

[40] --- F.3d ----, 2016 WL 3084272 (5th Cir. Mar. 30, 2016).

[41] *Id*. at *2.

[42] *Id*. at *3.

[43] *Id*. (emphasis added).

[44] *Id*.

No. 15-70033 Cons. w/ No. 16-70002

So too here. Sheard acted within the authorized scope of her appointment; she represented Wilkins in "available post-conviction process" in state and federal proceedings, including "applications for stays of execution and other appropriate motions and procedures" and "proceedings for executive or other clemency," as authorized by § 3599.[45] Sheard did not need to seek reauthorization from the district court before representing Wilkins in these subsequent proceedings.

Because Sheard acted within the scope of her appointment, she is potentially entitled to payment for her services. We therefore vacate the district court's order denying Sheard's CJA vouchers and remand to allow the district court to decide whether Sheard's requested fee constitutes appropriate compensation.

B.

The State of Texas explicitly "takes no position on whether the district court erred in denying counsel's payment request." Instead, the State claims that this Court lacks appellate jurisdiction to decide that issue because a "district court's review of a fee request is an administrative act and not an appealable judicial decision."

We generally lack jurisdiction over appeals from orders denying or reducing payment under a CJA voucher to the extent "that counsel disagrees with the *amount* of the payment."[46] That is because "[t]he specific amount of [a] CJA award is" generally "left to the unreviewable discretion of the district court."[47]

---

[45] *See* 18 U.S.C. § 3599(e).

[46] *Rojem v. Workman*, 655 F.3d 1199, 1202 (10th Cir. 2011) (quoting *United States v. French*, 556 F.3d 1091, 1094 (10th Cir. 2009)) (emphasis in original, brackets omitted). *Accord, e.g.*, *In re Carlyle*, 644 F.3d 694, 699 (8th Cir. 2011).

[47] *Hooper v. Jones*, 536 F. App'x 796, 800 (10th Cir. 2013).

Crucially, however, where the attorney does not merely dispute "the *amount* of expenses reasonably and necessarily incurred by counsel," but instead challenges the district court's ruling regarding "whether such services are compensable under the [CJA] as a matter of law" at all, then "this Court has appellate jurisdiction as to the district court's order."[48] In other words, where "the basis for the reduction" or denial of attorney's fees is not "an ad hoc administrative judgment about the appropriate size of counsel's fee," but rather "a decision regarding the proper reach of appointed counsel's authority under the CJA statute," then we may review the district court's order reducing or denying fees.[49]

To illustrate, in *Clark v. Johnson*, the petitioner attempted to appeal "the district court's ruling that counsel was not entitled to compensation and reimbursement . . . for expenses incurred in connection with [the petitioner's] state clemency proceeding."[50] We ruled that we had appellate jurisdiction over the case because the case "concern[ed] an interpretation of a federal statute by a federal district judge," rather than "an administrative decision about the appropriate amount of fees for an otherwise authorized activity."[51]

---

[48] *Clark v. Johnson*, 278 F.3d 459, 461 (5th Cir. 2002), *abrogated in non-relevant part by Harbison*, 556 U.S. 180 (emphasis added).

The Supreme Court has overruled *Clark's* holding that federal habeas counsel is not authorized to represent the petitioner in subsequent state clemency proceedings. *Compare Harbison*, 556 U.S. at 182-94 *with Clark*, 278 F.3d at 461-63. *See also Rosales v. Quarterman*, 565 F.3d 308, 312 (5th Cir. 2009) (recognizing that *Harbison* partially overruled *Clark*). However, *Clark's jurisdictional* holding remains valid after *Harbison. See Hooper*, 536 F. App'x at 798-99 (continuing to rely on *Clark's* jurisdictional holding after *Harbison*).

*Clark* was decided under 21 U.S.C. § 848(q), which was the predecessor to 18 U.S.C. § 3599. Because § 848(q) contained "essentially the same relevant language" as § 3599, *Clark's* jurisdictional holding survives the enactment of § 3599. *Kelly v. Quarterman*, 296 F. App'x 381, 381 n.1 & n.2 (5th Cir. 2008).

[49] *Hooper*, 536 F. App'x at 798.

[50] 278 F.3d at 461.

[51] *Id*.

No. 15-70033 Cons. w/ No. 16-70002

Here, too, Sheard is *not* disputing the *amount* of fees to which she is entitled. Instead, she is arguing that the district court misinterpreted § 3599 as a matter of law when it concluded that our order appointing her as appellate counsel did not automatically authorize her to represent Wilkins in subsequent state and federal proceedings as well. As a result, "[t]he decision whether to compensate" Sheard "involves interpreting and applying the provisions in § 3599 governing the authorized scope of a CJA appointment."[52] For that reason, we have jurisdiction to adjudicate Sheard's appeal.[53]

## V.

Accordingly, we (1) affirm the district court's order denying Wilkins's request for funds; (2) vacate the district court's order denying payment under Sheard's CJA vouchers; and (3) remand for further proceedings.[54]

AFFIRMED in part, VACATED in part, and REMANDED.

---

[52] *Hooper*, 536 F. App'x at 798.

[53] *See id.*

[54] We reject Sheard's request to reassign the case to a different district judge on remand. *See In re DaimlerChrysler Corp.*, 294 F.3d 697, 700 (5th Cir. 2002) (quoting *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997)) (holding that we may reassign a case to a different district judge on remand only in "extraordinary" and "rare[]" circumstances).