HELENE N. WHITE, Circuit Judge,
dissenting. I respectfully dissent.
The district court did not have the benefit of Matthews v. White, 807 F.3d 756 (6th Cir. 2015), which was decided during the pendency of this appeal, and directs that a *566 court’s determination whether § 3599(f) funds are reasonably necessary must focus on whether “a substantial question exists over an issue requiring expert testimony for its resolution and the [petitioner’s] position cannot be fully developed without professional assistance.” M at 760-61 (quoting Wright v. Angelone, 151 F.3d 151, 164 (4th Cir. 1998)). Matthews emphasized that clemency proceedings “are a matter of grace entirely distinct from judicial proceedings,” and that a petitioner requesting funds under § 3599(f) for the purpose of clemency proceedings need only “show that the requested services are reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice.” Matthews, 807 F.3d at 760 (quoting Brown v. Stephens, 762 F.3d 454, 460 (5th Cir. 2014) (quoting Harbison v. Bell, 556 U.S. 180, 192, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009))).
Neuropsychological Evaluation
As for Foley’s request for funding for a neuropsychological evaluation, the district court clearly erred in finding that Foley does not have a long history of multiple head injuries, given the affidavit of Foley’s mother,[1] and post-conviction testimony from his mother and brother. See Maj. Op. at 563-64. The district court’s rationale for denying expert funds, which the majority approves, Maj. Op. at 564-65, was:
Foley’s competency and mental health have been discussed, analyzed, and adjudged numerous times before this Court and others, and his arguments have been consistently been found to be without merit. Both this Court and the Supreme Court of Kentucky have held that Foley’s trial counsel was neither ineffective nor unreasonable for declining to request a competency hearing.
PID 611-12. But Foley does not seek to show that he is incompetent or not criminally responsible, and the district court’s reliance on prior court rulings unrelated to clemency contravenes the Matthews standard, under which a petitioner need only show that the requested services are reasonably necessary to provide the officials making the clemency determination “the information needed in order to determine whether to exercise their discretion to extend grace to the petitioner ...” Matthews, 807 F.3d at 760 (quoting Brown, 762 F.3d at 460). By applying an incorrect legal standard to Foley’s request for a neuropsychological evaluation, the district court abused its discretion. See Fautenberry v. Mitchell, 572 F.3d 267, 268-69 (6th Cir. 2009).
*567 Ballistics and Crime-Scene Reconstruction Expert
The district court also relied on the clearly erroneous factual finding that full review by a ballistics expert would duplicate Pershing Hayes’s testimony. At Foley’s murder trial, Hayes, a friend of Foley with no formal training in ballistics, was found unqualified as a ballistics expert and was not permitted to testify regarding an out-of-court experiment he conducted. Appendix V (8/31/1993 Trial Tr. 45, 108-09). In the experiment, Hayes borrowed a weapon that Foley’s trial counsel believed was a similar caliber weapon and fired it into a plaster wall. App. V 43. The trial court concluded that there was insufficient showing that the experiment duplicated the shootings. Id. at 43, 106.[2] Hayes was permitted to offer lay testimony, however, and testified that the bullets passed through something before hitting the wall, distorting the bullets, in one instance because a bullet shed its jacket. 9/1, 9/2 Trial Tr. 57-60. Hayes was not permitted to testify regarding the direction the bullets were fired from or the angle at which the bullets would have entered the wall. On cross-examination, Hayes testified he had no professional experience in ballistics examination and had never more than casually examined bullets that served as exhibits or been trained in how to identify bullets, agreeing that the jury was as qualified as he to determine whether a bullet’s jacket had been removed. Id. at 161-62. On recross, Hayes testified, “ballistic people in your lab could have given you a full analysis,” and that he was not qualified to perform that analysis. Id. at 75-76.
John Nixon’s affidavit
In stark contrast, the affidavit of John Nixon offered by Foley in his supplement/amendment to his § 3599(f) motion for expert funds provides:
1. Education & background. I am originally from the United Kingdom, where I worked as a scientist and professional engineer for the UK government, conducting weapons systems research, design, development, performance testing ... and forensic examinations, including firearms ... I am currently a consultant with Athena Research & Consulting LLC in Bippus, Indiana, specializing in technical and forensic consulting in the areas of incident scene reconstruction, firearms, ballistics, munitions, and explosives. I have conducted extensive forensic engineering research and have been responsible for numerous innovations in guns and munitions design. I have published numerous research papers and technical articles.... In addition to testifying in UK courts, I have testified as an expert in numerous US federal courts, and many state courts, including ... Kentucky ... A list of publications is included in my curriculum vitae, which is appended ...
2. I have examined materials provided by counsel for Mr. Foley in this case. These materials include that autopsy reports of both Rodney and Lynn Vaughn, as well as laboratory reports identifying the bullets and bullet fragments related to the case, including those recovered during the *568 autopsies. In addition, I have examined the report of Charles Lanham, with the Kentucky State Police, as well as a transcript of his trial testimony. I have also read transcripts of the trial testimony of Ronnie Dug-ger, Pershing Hayes, Danny Joe Bryant, Phoebe Watts and Robert Foley.
3. Based upon the testimony of these individuals, as well as the reports provided to me concerning the technical evidence/testimony, and autopsies in this case, I have concluded:
a. The trajectory of the bullets that impacted the body of Rodney Vaughn most likely indicate that he was kneeling at the time he was shot. I base this conclusion on the general trend of the bullets moving downward through the body, with most of the bullets entering in the back and exiting in the front. The downward trajectory, coupled with most of the projectiles having entered Rodney’s back, indicates that Rodney must have been kneeling as, had he been standing, it would have been impossible for him to lean far enough back to create those angles. The general bullet trajectory also makes it more likely that a relatively short shooter (consistent with Foley’s height [5’7”]) was standing.
b. Rodney’s injuries are consistent with him holding a gun at the time he was shot. The general trend of the bullet trajectory from left to right through Rodney’s body is consistent with him being in a Weaver stance at the time he was shot ... Someone who had experience firing handguns would be more likely to shoot using the popular Weaver stance.
c. Additionally, the fact that the entry wounds were high up on Rodney’s body indicates the likelihood . that he was holding a weapon at the time he received them ... The trajectory of the bullets that impacted Rodney, particularly those which indicate he was most likely on his knees and leaning back, would be consistent with him shooting at Lyn Vaughn while Robert Foley shot Rodney.
d. At least one of the bullet wounds to Lynn Vaughn was consistent with Robert Foley’s version of events, wherein Rodney Vaughn shot Lynn, while Lynn was charging towards him. The slight downward angle of the bullet through Lynn’s body is consistent with him leaning forward at the time he was shot. The bullet to the back of Lynn’s head is similarly consistent with Robert Foley’s version of events that Ronnie Dugger fired a shot into the back of Lynn’s head while he was lying on the floor. The slightly upward angle of the shot is consistent with someone firing from close range to the back of the head.
e. The bullet holes in the wall of the living room are also consistent with Robert Foley’s version of events. The two bullets that were in the wall above the fish tank were more likely to have come from the area where Robert Foley indicated Rodney Vaughn was firing from (at Lynn Vaughn). The bullet hole in the corner of the living room was more consistent with someone firing from where Robert Foley was standing. Had *569 the bullet been fired from where Robert Foley was standing, one would expect to see a shallow groove running along the wall towards the hole where the bullet gradually entered, due to the oblique angle. There was no evidence that this was the case and, consequently, the hole is consistent with someone firing from approximately where Robert Foley alleged Lynn Vaughn was standing, towards where Robert Foley alleged Rodney Vaughn was located.
Nixon affidavit, PID 289-291 (R. 127-1) (emphasis added).
Clearly, full review by a ballistics and crime-scene-reconstruction expert would not simply duplicate Hayes’s testimony.
Lastly, the district court found that because Foley “now has the benefit of [Nixon’s] expert opinion,” further analysis would be duplicative. PID 618. Foley’s Supplement to his Motion for Expert Funding explained that Nixon performed only a limited review of some of the case materials:
By raising small amounts of money from family, friends, and activists, Mr. Foley was able to obtain a limited review of some of his case materials by [expert John Nixon]. The expert’s findings make clear that a full review of Mr. Foley’s case by a crime scene reconstruction expert and ballistics expert are reasonably necessary for Mr. Foley’s clemency proceedings.
A complete review would entail (a) reviewing all the case materials, rather than the limited materials Nixon was able to review for the limited amount of money raised by Mr. Foley; (b) producing diagrams of the projectiles based on witnesses’ testimony and the autopsy reports; and (c) producing a computer animation of events based on "witnesses’ testimony and the autopsy reports.
PID 287 (emphasis added). Because Foley raised only limited funds and Nixon thus did not review all the case materials, Foley has adequately shown that the service requested, a ballistic and crime-scene reconstruction expert, is “reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice.” Matthews, 807 F.3d at 760 (quoting Brown, 762 F.3d at 460).
The district court’s remaining reason for denying Foley expert funds under § 3599, unfavorable federal and state adjudications, is based on an improper legal standard not applicable to clemency proceedings. Matthews, 807 F.3d at 761. The district court’s opinion relied on Foley’s failure to convince the Kentucky Supreme Court and several federal Magistrate Judges that expert funding was reasonably necessary and the fact that “[t]he jury, along with various appellate and reviewing courts ... found the overwhelming evidence of guilt far outweighed any far-reaching allegation of self-defense and actual innocence.” PID 615-18.
Even assuming, as the majority states, that the district court “independently reviewed the record,” Maj. Op. at 564, 'its review clearly was not guided by Matthews. Because the district court applied an incorrect legal standard to Foley’s § 3599(f) request for ballistics and crime-scene-reconstruction expert funding, it abused its discretion. See Fautenberry, 572 F.3d at 268-69.
I would remand to the district court for reconsideration in light of Matthews, particularly given that the Kentucky Attorney *570 General’s office notified this court in advance of argument that it would no longer defend the district court ruling and “does not believe Kentucky has a stake in Foley’s request for federal expert funds ... to be used in the preparation of his state clemency petition.” EOF 64 filed 4/18/2016.

. According to Lois Foley, she was very young when she got pregnant with Foley and her “sister told me how to abort my baby by drinking bitters mixed with other things. This did not work but I was sick afterwards." Further, when Foley’s umbilical cord fell off she was frightened and threw him across the room and he hit his head on a chair; when he was four he fell off a highchair and out a window and hit his head; when he was seven he fell from a car and hit his head; and at age sixteen or seventeen, he was electrocuted by a live 220-volt electrical wire -while trying to fix a water pump. Foley also fell from a horse when he was seventeen and hit his head, was in two car wrecks between ages eighteen and nineteen, and suffered head injuries in both. Lois Foley did not seek treatment for Foley. Further, Foley was in another car accident in 1991 where he suffered head trauma and was treated. Finally, Lois Foley averred that although she spoke with Foley's trial counsel, they never talked about family history and she was not asked to testify on her son's behalf. PID 461-62. In February 2011, Foley fell in his cell and hit his head and was unable to answer questions concerning time, day, etc., but the more he spoke the more oriented he became.

. When the trial court ruled Hayes unqualified to testify as a ballistics expert and the court stated it would recess for lunch, trial counsel requested a half-day continuance to secure another ballistics expert. The trial court denied the continuance but stated it would consider the request later in the afternoon. Id. at 112. After the lunch recess, trial counsel requested that Hayes be permitted to offer lay testimony to the jury. The trial court agreed. Id. at 118.