PRISCILLA R. OWEN, Circuit Judge,
concurring in part and dissenting in part:
This is the third time that Panetti has claimed, based on Ford,[1] that he is incompetent to be executed. If the federal district court’s order denying Panetti’s motion for funds to retain experts and investigators to pursue that claim should be affirmed, then whether the Texas state courts denied due process to Panetti is irrelevant. I would affirm the federal district court regarding funds for experts, and I therefore primarily consider the federal district court’s rulings. In reversing the federal district court, the majority opinion effectively applies a de novo standard of review, though an abuse of discretion standard governs the denial of a motion under 18 U.S.C. § 3599(f),[2] and the majority opinion concludes that the passage of time is sufficient to require the appointment of experts and investigators to examine the defendant’s competency anew.[3] With regard to Panetti’s constitutional due process claim, the majority opinion reverses the federal district court because of two filings the State made the same day the district court issued its ruling, even though none of the district court’s citations to the evidence on which it relied include the State’s submissions. In so doing, the majority opinion again fails to employ proper appellate standards of review.
I agree that Panetti was and is entitled to appointed counsel at every step of the ongoing legal proceedings. But the error in failing to appoint counsel is not a dispositive issue and does not warrant a continued stay of execution since Panetti was actually represented by his former federal habeas counsel, who proceeded pro bono in the state courts and in federal district court, and they capably represented him. (They are entitled to compensation for that and any future representation, as long as they remain appointed counsel pursuant to 18 U.S.C. § 3599).[4]
The dispositive question is whether the federal district court abused its discretion in denying Panetti’s request for funds for experts and investigators when (1) Panetti has maintained in the most recent round of state and federal court proceedings that he cannot make the threshold showing required by Ford (“a substantial threshold showing of insanity”)[5] unless and until a court orders funding for experts and investigators,[6] and (2) the facts presented by *380 Panetti to the district court in support of his renewed claim that he is incompetent to be executed do not differ in any meaningful way from the facts exhaustively examined by the district court in two prior Ford hearings.
The panel’s majority opinion obfuscates the core inquiry and, I submit with great respect, does not objectively consider the record or the actual bases' for the district court’s conclusion that Panetti has not made a sufficient showing to require the appointment of experts in order to litigate, once again, whether he is competent to be executed.
I
There is no question that Panetti was entitled to appointment of counsel to represent him when the State of Texas once again set an execution date. I agree with the majority opinion on that score. But counsel actually represented Panetti, and the fact that they were not compensated at the time is not a basis for further staying the execution. The record reflects that counsel performed effectively in state court but concluded that they could not, or should not, proceed to file a motion under Texas Code of Criminal Procedure Article 46.05 without funding from a court to retain mental health experts and investigators to attempt to develop the record. The lack of experts, rather than the lack of counsel, or counsel’s need for additional time, was the pivotal issue in state court and in federal district court.
II
Quoting Ford and citing Panetti, the federal district court concluded that “Panetti has failed to make the ‘threshold showing’ which would trigger his entitlement to the relief he seeks.”[7] The court explained that, in response to Panetti’s most recent claim, it had “[c]onduct[ed] a fresh inquiry into Panetti’s mental state at the threshold” and found that
Panetti has failed to make the necessary showing of incompetency warranting, for the third time ... authorization of funds to hire mental health experts, and a stay of execution. Panetti has extensively litigated this issue, and has presented no evidence of incompetence different in kind from that previously considered and ultimately rejected by this and other Courts.[8]
These determinations are fully supported by the record. Panetti failed to present facts to the district court regarding his behavior or mental state- since -the last competency hearing that would permit an expert to present opinions that materially differed from the expert opinions that the district court heard in the prior competency-to-be-executed hearings. Unless facts are presented that truly differ from the nature of the facts previously presented, there is no need to fund experts to *381 opine further. Panetti was accorded due process.[9]
For the same reasons, the appointment of experts is not “reasonably necessary for the representation of the defendant,” within the meaning of 18 U.S.C. § 3599(f). Section 3599(f) does not mandate the appointment of experts or investigators. Rather, it provides that
[u]pon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant ..., the court may.authorize the defendant’s attorneys to obtain such services ,.. and, if so authorized, shall order the payment of fees and expenses.[10]
This court has interpreted “reasonably necessary” to require a petitioner to show that he has “a substantial need” for the requested assistance.[11] “[A] district court may deny an inmate’s request for funds “when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred, or (b) when the sought-after assistance would only support a meritless claim, or (c) when the sought after assistance would only supplement prior evidence.’ ”[12] Our review.of the district court’s ruling is for abuse of discretion.[13]
Panetti’s current claim that he is incompetent to be executed is not “a viable constitutional claim”[14] because, as the district court found, the facts supporting his most recent claim of incompetency are not different in kind from the facts supporting an earlier claim of incompetency. The .earlier claim was rejected after an extensive hearing, detailed findings by the district court, and appellate review by this court and the Supreme Court.
Because the facts presented to the district court in support of Panetti’s most recent Ford claim are not different in kind from those supporting his last claim -of incompetency, the expert assistance that is sought “would only supplement prior evidence.”[15] In the prior competency hearing, the district court considered expert opinions that Panetti was incompetent to be executed. Those opinions were based on the same “kind” of facts that Panetti has presented in support of his most recent claim of incompetency,[16] and the federal district court did not find those expert opinions persuasive.
In analogous circumstances, this court held in Smith.v. Dretke, a capital case, that the district court did not abuse its discretion in denying funds for the assistance of a psychologist in federal habeas proceedings,[17] Smith argued that an expert could *382 evaluate his drug and alcohol abuse “to determine whether it would support a defense mitigation theory,” but this court held that “[t]he question of mental capacity ... was presented in this instance to the jury at trial” and that the evidence Smith sought to develop would only be supplemental.[18] The federal district court in the present case heard a vast amount of evidence presented by Panetti in the prior competency hearing, and the district court found that the new evidence that Panetti presented was not different in kind from that already considered. The assistance of new experts would only supplement prior evidence of the same nature.
Ill
The bases upon which the majority opinion reverses the district court’s denial of funding for experts do not withstand analysis.
A
The majority opinion concludes that “[rjather than ... cleansing ... the denial of due process [by the state courts] we have described,”[19] the federal district court, “[p]ressed by the looming execution date, ... proceeded upon the flawed record that denial produced.”[20] The “result was nigh inevitable,”[21] and the federal district court likewise denied Panetti due process, the majority opinion concludes.[22]
The federal district court had before it Panetti’s motion to stay the execution and a motion to fund experts. The district court was certainly aware that it could grant a stay of the impending execution if the court needed additional time. It did not grant such a stay, and in light of the decades of experience that the judge possesses, and the detailed order that the court issued, it is evident that the court denied the motion for a stay after careful deliberation, not because it was “[p]ressed by the looming execution date.”[23] Panetti was urging the district court to give him more time to develop a factual record regarding his competency and to appoint experts to review the evidence of Panetti’s mental state since the last competency hearing. That could not have been lost on the federal district court. Panetti argued to the federal district court that the record in the state court was inadequate and that he had been denied due process. The district court nevertheless denied Panetti’s motion for appointment of experts. The request for funding for experts was the primary thrust of Panetti’s motion in the federal district court. To suggest that the district court was led down the proverbial primrose path by error in the state courts implies that the federal district court was either impotent or inept. It was neither. The district court ruled on the 18 U.S.C. § 3599(f) motion to appoint experts after “[c]onducting a fresh inquiry into Panetti’s mental state at the threshold.”[24] The federal district court was well within its discretion in denying that motion.
B
As discussed, our court has held that a district court may deny a § 3599(f) motion to fund experts “when the sought after assistance would only supplement prior ev *383 idence.”[25] The majority opinion concludes that “[t]he reality is that a decade has now passed since the last determination of whether this concededly mentally ill petitioner is competent to be executed. Given that lapse of time, we cannot say that any new evidence would only be ‘supplemental’ to that already contained in the record.”[26] This is erroneous for at least three reasons.
First, the burden of proof is on the defendant who is seeking public funding for experts. The lapse of time says nothing about whether the evidence the defendant hopes to offer through an expert will be new, rather than supplemental, evidence. The majority opinion fails to hold Panetti to his burden of proof.
Second, and more fundamentally, it cannot simply be assumed, as the majority opinion does, that because of the passage of time, appointment of experts is “reasonably necessary.”[27] Such an assumption is an arbitrary interpretation and application of § 3599(f), and it is a standardless means of allowing federal courts to second-guess and reverse state courts, contrary to the precepts contained in AEDPA.
Third, such an assumption is not a valid reason for reversing a federal district court when we are reviewing a denial of funding for experts under § 3599(f). Our review is for an abuse of discretion. We cannot legitimately say that, as a matter of law, a district court must grant funding for experts to examine a defendant’s competency when the last competency hearing was years earlier, even when all agree that the defendant suffers from mental illness.
C
The majority opinion places great, and repeated, emphasis on the fact that the State filed an expert’s affidavit in the Texas Court of Criminal Appeals (TCCA) and in the federal district court, and that, without notice to Panetti, the State recorded a two-hour conversation he had with his parents on November 4, 2014.[28] However, neither the affidavit nor the recording was actually considered by the TCCA or relied upon by the federal district court. The majority opinion is incorrect in concluding that the mere filing of the affidavit or recording resulted in a denial of due process to Panetti and warrants reversing the federal district court.
After the state trial court denied Panet-ti’s request for funding for experts and a stay of the execution, and while an appeal of that ruling was pending before the TCCA, the State, on November 24, 2014,[29] filed with the TCCA an affidavit from Dr. Joseph Penn, Director of Mental Health Services in the Correctional Managed Care division of the University of Texas Medical Branch. Dr. Penn had reviewed Panetti’s medical records and opined in the affidavit that Panetti did not exhibit behaviors that interfered with his daily functioning or required treatment with medications. The State had also recorded a conversation that occurred on November 4, 2014, between Panetti and his parents. The recordings were made without Panetti’s knowl *384 edge, which certainly was not a violation , of due process. An inmate’s phone conversations may be intercepted and recorded unless privileged,[30] and Panetti’s conversation with his parents was not privileged. He does' not contend otherwise, Panetti had no expectation of privacy when he conversed with his parents.[31] Regardless, however, neither the Penn affidavit nor the 2014' recorded conversation was considered by the TCCA or the federal district' court.
We know, as a matter of law, • that the TCCA did not consider or rely bn the Penn affidavit or the recording because one day after the State’s' filing, the TCCA denied Panetti’s petition on the basis that it lacked jurisdiction to review the trial court’s order.[32] The TCCA reasoned that Panetti had not filed an Article 46.05 pleading and that no authority permitted the court to review a “freestanding motion,” such as the one that Panetti had filed.[33] (The TQCA did not, as the majority opinion asserts,[34] state that untimeliness was an additional reason for denying the motion). Accordingly, the TCCA did not reach the merits of Panetti’s claim, and the State’s new evidence played no part in the TCCA’s ruling.
The majority opinion- says this “misses the point.”[35] It then engages in an impassioned argument and cites the dissenting opinion in the TCCA.[36] But none of what the. majority opinion says addresses whether this court can legitimately say that the State’s, mere filing of the Penn affidavit or the recording with the TCCA amounted to a. denial of due process. As a court, we must adhere to well-settled principles of appellate review. We must consider the actual holding in the TCCA’s order, issued by a majority of that court. That order reflects that the TCCA concluded that the court did not have jurisdiction to consider Panetti’s motion, which means that it did not, as a matter of settled law, consider either the Penn affidavit or the recorded conversation. This court cannot, therefore, conclude that filing the affidavit or recording with the TCCA resulted in a due process violation.
With regard to the federal district court’s denial of funds for experts, the majority opinion says that the district court' “stated that it had considered ‘the wealth of evidence on the issue of Panetti’s competency,’ ” and “that basis for conclusion surely included all' of the State’s last- *385 minute submissions.”[37] The opinion then asserts that the federal district court must have affirmatively “weighted] .Panetti’s” new evidence against “the state’s evidence of Dr. Penn’s affidavit and the recording of Panetti and his family.”[38] However, when a district court sets forth the specific factual bases for its factual findings, as in the present case, an appellate court cannot assume that the district court relied on other facts in the record to reverse the district court, if the appellate court is properly applying the abuse of discretion standard. The district court’s order reflects that its finding were reached after considering Panetti’s new evidence (not the State’s) as weighed against the evidence “previously amassed in this case,”[39] which unmistakably refers to the prior competency hearings.
The State filed the Penn affidavit with the federal district court on' November 26, 2014, as an attachment to its response to Panetti’s motion for a stay of execution, appointment of counsel, and request for funding for experts. The district court’s decision, denying Panetti’s requests, issued the same day, November 26, 2014. The only possible mention of the State’s new evidence is a reference in the opening paragraph of the federal district court’s order to “Respondent’s Response in- Opposition [#181] ” and the statement in that same paragraph that the court had “reviewed the documents, the governing law, and the file as a whole,”[40] However, the district court’s analysis of the evidence and its reasoning reflect that it did not rely on the State’s new evidence at all in concluding that Panetti had failed to present “a substantial threshold showing of insanity”[41] and was competent to be executed. The district court’s order details the evidentiary basis for its conclusions and provides citations, none of which are to the State’s new evidence. The federal district court considered only Panetti’s evidence[42] and whether Panetti’s behavior, as documented in Panetti’s evidence, was “measurably different from the behavior documented in the records scrupulously examined by this Court in its March 26, 20Q8 Order.”[43] The district court then detailed evidence from Panetti’s prior competency hearings.[44]
The majority opinion declares that’ “it is one thing to respond to a petitioner’s claims on the existing record; it is quite another, .with assistance of counsel and paid experts, to generate new evidence while preventing the petitioner from doing the same.”[45] The majority opinion concludes that Panetti is entitled to proceed to prepare yet another federal habeas petition “with fully armed counsel,” meaning counsel armed with experts.[46]
If the district court judge had done what the majority opinion says he did, I would *386 join in reversing the district court’s judgment. But he did not. He prudently considered only the new evidence offered by Panetti, measured it against the mountain of evidence adduced in prior proceedings, and correctly concluded that Panetti’s new evidence (not the State’s new evidence) was not “measurably” different from the evidence that the district court had previously considered.
D
The majority opinion recounts evidence, emphasized in an amicus brief, to argue that Panetti has made an adequate showing that he is incompetent to be executed.[47] All of this evidence was presented to the federal district court in Panetti’s submissions to that court in greater detail than set forth in the majority opinion, and none of it is different in kind or nature from evidence that the district court heard in Panetti’s prior competency hearings.
The citations to the arguments counsel made in briefing to the federal district court are footnoted following each of the factual matters set forth in the majority opinion[48] as follows:
• “escorting officers have noticed that Panetti often acts in an irrational and delusional manner”[49]
• “despite having refused mental health treatment for nearly two decades, Panetti has, in the last few years, begun requesting mental health assistance and medication”[50]
• “Panetti has expressed the belief that Texas has implanted a listening device in his tooth that sends command messages to his brain”[51]
*387 • “Panetti reads the Gospel to help drown out the voices he hears”[52]
• “Panetti has expressed the belief that CNN anchor Wolf Blitzer displayed Panetti’s stolen TDCJ ID card during a report”[53]
• “Panetti has claimed to be the father of actress and singer Selena Gomez”[54]
The federal district court found that “[w]hile much of the behavior recounted in the new TDCJ records provided by Panetti is certainly strange, it is not measurably different from the behavior documented in the records scrupulously examined by this Court in its March 26, 2008 Order.”[55] The district court’s order under consideration in the present appeal then sets forth some of the evidence from the prior competency hearings that is no different in kind or character from Panetti’s new evidence:
For example, as explained in the [March 26, 2008] Order, Dr. Mary Alice Conroy testified during this Court’s 2004 eviden-tiary hearing that Panetti “believed he has been under attack by ‘supernatural demonic anti-forces’ since the mid-1980s, when demons were possessing his house and personal belongings.” Mar. 26, 2008 Order [#146] at 26. Panetti told Conroy he believed the State “want[ed] to execute him to stop him from preaching[.]” Id. Panetti discussed the alleged influence of his alternate personality, “Sarge,” over him when he committed the 1992 murders with at least two of the 2004 experts. Id. During the 2008 evidentiary hearing, Panetti told Dr. David Self he was on Death Row “[t]o preach the Gospel of Jesus Christ” and he was sentenced to die because people “have strong delusions.” Id. at 32-33. Panetti discussed his purported multiple personalities with Self, who summarized the discussion:
Will James was ‘king of the cowboys’ and had written 24 books, and was a boyhood hero and fantasy object of [Panetti’s]. He described Sergeant Iron Horse [“Sarge”] as having begun as a childhood fantasy of ‘the eternal mercenary’ but later in life having been a manifestation of mental illness, and that the mental illness was a manifestation of spiritual wickedness.... He claims that command type hallucinations from Sergeant Iron Horse were partially responsible for his having murdered his in-laws. He also reported that he heard ‘demons cackling’ after the murders, and that those same demons cackled at Jesus’ crucifixion.[56]
Facts set forth in the district court’s decision at the conclusion of the last competency hearing, in 2008,[57] regarding Pan-etti’s mental state and behavior are not materially different from the more recent *388 facts that the majority opinion recounts. For example:
• “[Panetti’s] wife described episodes of ‘paranoid thinking including a belief the devil was in the furniture and burying some [furniture] outside; nailing curtains shut so neighbors wouldn’t film them etc.’ ”[58]
• “Panetti stated he has heard voices and music since he was an adblescent (prior to any alcohol or drug abuse), but the' voices do not tell him to harm himself or others. He stated he drank alcohol ‘to quiet the voices.’ ”[59]
• “Panetti also stated he had post traumatic stress disorder (PTSD) from his time as a Navy SEAL with a top secret security clearance in Thailand and Cambodia. He recounted detailed stories about this experience, but-the evaluator noted ‘his military records show he was never overseas.’ ”[60]
• “[I]n December of 1995, Panetti was referred to the Jester IV Crisis Management unit of the Texas Department of Corrections because he ‘appealed] to be delusional and verbalized auditory and visual hallucinations,’ ”[61]
• “In June of 1996, Panetti began refusing to groom because he had taken a ‘Nazarat vow’, as ‘an alternative to his not getting the medical and psychiatric treatment he thinks he needs.’ ”[62]
• “In October of 1996, Panetti reported hearing ‘Bob Dylan lyrics’ in his head and feeling ‘spiritually persecuted’ because of his beard.”[63]
• “While his state application was pending, on September 29, 1997, Panetti was. again admitted to the Jester IV Acute Care Unit, complaining of auditory and visual hallucinations, He had told TDCJ medical staff he ‘needed to get back on my medicine that I had in the freeworld.’ ”[64]
• “[H]e told the State’s- experts the same thing he told the defense experts: he believed the State wanted to execute him for preaching the gospel.”[65]
• “Panetti did claim=to have seen angels who appeared in the form of TDCJ corrections officers-on several occasions since , [he claims to have been healed of his mental illness].”[66]
• “Dr. Self noted that Panetti’s medical history contains references to delusions and hallucinations as far back as the late 1970’s, which predate any motive to malinger.”[67]
• “[In 2007, Panetti] made reference to conspiracies, such as big corporations and the Bush family being in league with the devil. He described two instances in which angels visited him in the form of correctional officers.”[68]
In short, there was nothing new about the evidence that Panetti presented to the federal district court regarding his most recent, and third, Ford claim. Experts had opined in 2008 that Panetti was not competent to be executed based on the foregoing, and many other, facts. The federal district court’s decision at the conclusion of the *389 last competency-to-be-executed hearing reflected that the “2008 hearing was exhaustive.”[69] The court “heard expert opinions from psychiatrists, pyschologists [sic], and neuropsychologists for both Panetti and the State.”[70] It “heard testimony from fellow inmates and the guards and chaplain who have had contact with Panetti on Death Row.”[71] The federal district court “reviewed volumes of medical, social security, and prison records regarding Scott Panetti’s longstanding mental illness and delusions” and heard “eleven hours of conversations between Panetti himself and his parents and other visitors, recorded by the State during his visitation hours in December of 2007 and January of 2008.”[72] The district court was not persuaded by the opinions or analyses of Panetti’s experts in the 2008 hearing and found Panetti competent to be executed.[73]
In the present case, the evidence is overwhelming that “the sought after assistance would only supplement prior evidence”[74] and therefore that the district court did not abuse its discretion in denying Panetti’s motion under .18 U.S.C. § 3599(f) for funds to retains more experts. Nor can it plausibly be said that due process requires appointment of experts.
IV
“Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition.”[75] It should also be evident that “[ejach competency proceeding may well be a discrete proceeding that is largely if not entirely independent of the outcome of prior incompetency proceedings.”[76] But when the evidence in support of a successive Ford claim is no “different in kind from that previously considered and ultimately rejected by this and other Courts,” as found by the district court in the present case,[77] then a defendant should not be entitled to a successive Ford hearing.
The Supreme Court has not articulated the threshold showing that a capital defendant, previously found to be competent to be executed, must make when he subsequently challenges his competency anew. Concern was raised, however, in Ford v. Wainwright[78] itself regarding successive claims by condemned inmates that they are not competent to be executed.
In Ford, Justice Marshall opined that “[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity.”[79] Justice O’Connor warned of a potentially endless cycle of competency litigation in her dissent:
[T]he potential for false claims and deliberate delay in this context is obviously enormous. This potential is exacerbated *390 by a unique feature of the prisoner’s protected interest in suspending the execution of a death sentence during incompetency. By definition, this interest can never be conclusively and finally determined: Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary.[80]
Justice Rehnquist noted in his dissent that “[a] claim of insanity may be made at any time before sentence and, once rejected, may be raised again; a prisoner found sane two days before execution might claim to have lost his sanity the next day, thus necessitating another judicial determination of his sanity.”[81]
The controlling opinion in Ford was that of Justice Powell,[82] and in Panetti, the Court confirmed that Justice Powell’s opinion “states the relevant standard as follows. Once a prisoner seeking a stay of execution has made ‘a substantial threshold showing of insanity,’ the protection afforded by procedural due process includes a ‘fair hearing’ in accord with fundamental fairness.”[83] The Court explained that “[t]his protection means a prisoner must be accorded an ‘opportunity to be heard,’ though ‘a constitutionally acceptable procedure may be far less formal than a trial.’ ”[84]
The due process framework set forth in Ford and Panetti was applied to a defendant’s first claim that he was incompetent to be executed. The Court did not indicate whether the same construct would apply after a defendant had been found competent to be executed in proceedings that had accorded him full due process. But it would seem illogical for the Court to conclude that the same evidence presented in the first proceeding could be used to establish “a substantial threshold showing of insanity”[85] when a second claim was subsequently asserted. To do so would accord no finality to prior adjudications. If it is correct that when a defendant relies only on the same evidence previously presented in a competency hearing at which he was found competent, he has failed to make a “substantial threshold showing of insanity” in a subsequent claim of incompetence, it follows that if new evidence presented to support a second claim is not “different in kind from that previously considered,”[86] then due process does not require all of the procedures that were employed when the competency claim was first raised. Due process requires an opportunity to be heard so that a court may assess whether there is a reasonable probability that the defendant’s mental condition has changed to the point that he is incompetent to be executed.
Panetti had an opportunity to be heard, the federal district court considered the merits of his competency claim, and Panet- *391 ti failed to make the necessary threshold showing. A further stay of execution and the appointment of new experts are not warranted and are not required in order to provide due process to Panetti.
What our court said in upholding the district court’s conclusion that Panetti was competent to be executed, after considering all of the evidence presented in the prior competency hearing, bears repeating:
The district court then turned to apply its “rational understanding” test to the facts at hand. After reviewing the expert testimony on Panetti’s competency in painstaking detail, the court agreed with the defense’s experts that “Panetti is seriously mentally ill” and concluded that “it is not seriously disputable that Panetti suffers from paranoid delusions of some type.” However, the court implicitly agreed with the State that Panetti was exaggerating some of his symptoms to avoid execution, observing that Panetti demonstrated a “fairly sophisticated understanding of his case” and that his refusal to cooperate with the State’s experts stood in marked contrast to his treatment of the defense’s experts. Ultimately, the court determined that Panetti “has both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two,” as demonstrated “most clearly” by his statements to Dr. Waldman “that the death penalty is wrong in his case because he was- schizophrenic when he killed his in-laws.” According to the court, Panetti’s remarks imply that he “understands he is being executed to punish him for killing his in-laws, but feels the state is not justified in taking this position because of his mental illness.” As “Ford ... does not require that a prisoner agree with his punishment—simply that he rationally understand it,” the court concluded that Pan-etti was competent to be executed.[87]
Panetti has not presented any evidence that his current competency to be executed is any different from what is described above.
* * *
I agree that Panetti is entitled to representation by paid appointed counsel, but I would otherwise affirm the district court’s order, in which it determined that Panetti is not entitled to funds for experts and that he is competent to be executed. I would therefore lift the stay of execution.

. Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

. See Brown v. Stephens, 762 F.3d 454, 459 (5th Cir. 2014) ("We review the denial of funding for investigative or expert assistance for an abuse of discretion.”).

. Ante at 375 (“The reality is that a decade has now passed since the last determination of whether this concededly mentally ill petitioner is competent to be executed. Given that lapse of time, we cannot say that any new evidence would only be ‘supplemental’ to that already contained in the record.” (footnote omitted)).

. See Battaglia v. Stephens, 824 F.3d 470, 474 (5th Cir. 2016) (citing Rosales v. Quarterman, 565 F.3d 308, 312 (5th Cir. 2009) (per curiam)).

. Ford, 477 U.S. at 426, 106 S.Ct. 2595 (Powell, J., concurring) (concluding that a State "may require a substantial threshold showing of insanity merely to trigger the hearing process”); see also Panetti v. Quarterman, 551 U.S. 930, 949, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (holding that "Justice Powell's opinion [in Ford] constitutes ‘clearly established’ law for purposes of § 2254 and sets the minimum procedures a State must provide to a prisoner raising a Ford-based competency claim”).

. See, e.g., Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 9 (W.D. Tex. Nov. 26, 2014) *380 (“Panetti argued before the state courts that 'although he has made a colorable showing of incompetence without necessary funding to obtain the assistance of mental-health experts, he c[an]not show his incompetence under the standard set forth in Article 46.05(e).” (quoting Panetti v. State, No, AP-77, 2014 WL 6764475, at *1 (Tex. Crim. App. Nov. 25, 2014))).

. Panetti, No. 1:04-CV-42-SS, slip op. at 8 (quoting Ford, 477 U.S. at 426, 106 S.Ct. 2595 (Powell, J., concurring) and citing Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007)).

. Id., at 13; see also id, at.9 (“The Court finds, considering the question in light of the wealth of evidence on the issue of Panetti’s competency previously amassed in this case, Panetti’s evidence of incompetence is insufficient to make the threshold showing necessary to trigger Ford").

. See generally Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("(D)ue process is flexible and calls for such procedural protections as the particular situation demands.” (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972))),

. 18 U.S.C. § 3599(f) (emphasis added).

. Brown v. Stephens, 762 F.3d 454, 459 (5th Cir. 2014) (quoting Riley v. Dretke, 362 F.3d 302, 307 (5th Cir. 2004)).

. Id. (quoting Smith v. Dretke, 422 F.3d 269, 288 (5th Cir. 2005)); see also Smith, 422 F.3d at 288 (interpreting former 21 U.S.C. § 848(q)(9), the predecessor to 18 U.S.C. § 3599(f), the same way); USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 222, 120 Stat. 192, 231 (2006).

. See Brown, 762 F.3d at 459.

. Id.

. Id.

. See Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

. 422 F.3d at 288-89.

. Id.

. Ante at 377.

. Ante at 377.

.Ante at 377.

. Ante at 376.

. Ante at 377.

. Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

. Brown, 762 F.3d at 459 (quoting Smith, 422 F.3d at 288).

. Ante at 375 (footnote omitted).

. Ante at 375 (quoting 18 U.S.C. § 3599(f)).

. See, e.g., ante at 376 (“[The State] deployed its able death penalty lawyers, aided by a medical expert, Dr. Penn, and recorded Pan-etti with his family—filing Dr. Penn’s affidavit and the recording with both the TCCA and federal district court.”).

. See Reply Brief of the State of Texas, State v. Panetti, No. AP-77, 2014 WL 6764475 (Tex. Crim. App. Nov. 25, 2014).

. See United States v. Harrelson, 754 F.2d 1153, 1168-69 (5th Cir. 1985) (rejecting a challenge to evidence obtained through electronic surveillance and upholding the admissibility of recordings of conversations of an inmate with his wife and brother, an attorney, concluding the conversations were not privileged).

. See id. at 1169 ("The question presented here is thus whether' the Harrelsons had a reasonable expectation of privacy as they spoke to each other in jail. The answer must be that they did not. It is unnecessary to consult the case law to conclude that one who expects privacy under the circumstances of prison visiting is, if not actually foolish, exceptionally naive,”); see also United States v. Van Poyck, 77 F.3d 285, 290-91 (9th Cir. 1996) ("[N]o prisoner should reasonably expect privacy in his outbound telephone calls.”); United States v. Sababu, 891 F.2d 1308, 1329 (7th Cir. 1989) ("We believe that it was unreasonable for [the defendant] to expect that telephone calls she placed to an inmate in a high-security federal penitentiary would be private.”),

. Panetti v. State, No. AP-77, 2014 WL 6764475, at *1 (Tex. Crim. App. Nov. 25, 2014).

. Id.

. Ante at 372.

. Ante at 377,

. Ante at 376-77.

. Ante at 377.

. Ante at 377.

. Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 9 (W.D. Tex. Nov. 26, 2014) ("The Court finds, considering the question in light of the wealth of evidence - on the issue of Panetti’s competency previously amassed in this case, Panetti's evidence of incompetence is insufficient to malee the threshold showing necessary to trigger Ford.” (emphasis added)).

. Id. at 1 (brackets in original),

. See Ford v. Wainwright, 477 U.S. 399, 426, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Powell, J., concurring).

. Panetti, No. 1:04-CV-42-SS, slip op. at 8-9.

. Id. at 8-12.

. Id. at 10-12.

. Ante at 376.

. Ante at 376.

. Ante at 378.

. Ante at 378.

. See Motion for Stay of Execution at 13-14, Panetti v. Stephens, 1:04-CV-42-SS (W.D. Tex. Nov. 25, 2014), ECF No. 176:
Less then [sic] a year ago, during mental health rounds, one of the treatment staff reported that:
While passing [Mr. Panetti’s] cell, offender began making irrational comments to the escorting officer about the food trays. MHCM [Mental Health Care Management] asked offender how he was doing. He talked about his belief in God maintaining him but said he was thinking of contacting MH [Mental Health], MHCM inquired as to why. He said he thinks he may need some assistance. After a few minutes of interviewing the offender, it appears that the offender is reporting that he has always heard voices, but for many years has dealt with them though reading the bible [sic] and prayer. He said a long time ago (before EMR [Electronic Medical Record]) he took antipsychotics. He said he remembers most of them caused him severe SEs [side effects] so he decided not to take them, but he asked if he could be referred to a clinician because he thinks he may need medicine again. He is finding it more difficult to function with only prayer and bible [sic] reading to sustain him, particularly over the past two years. MHCM told the offender he would review the record and make referrals as indicated.

. See id.; see also id. at 15 ("TDCJ records indicate that in the past two years alone, Mr. Panetti made at least three additional requests for mental health assistance. On August 17, 2012, he submitted a written request for an ‘overall check-up,’ including a mental health assessment. Ex. C at 8. On November 12, 2013, Mr. Panetti. filed a Health Services request, asking to see a ‘psych.’ Id. at 9. Finally, on November 21, 2013, Mr. Panetti wrote to complain about not getting enough protein and salt in his diet, admitting that ‘my mental health seems to be affected,’ Id. at 10.”).

. See id. at 26 (reflecting an account from one of Panetti’s lawyers that “Mr. Panetti also pointed to a gold tooth on the right side of his mouth. He suggested, via a combination of mouthed words and pointing and exaggerated nodding, that he thought TDCJ had implanted a listening device in the gold tooth.”); id. at 28 ("Later, he told [one of his attorneys] that he thought he was hearing voices from the *387 surveillance device implanted in his tooth. He believes that TDCJ correctional officers receive details about his actions and thoughts transmitted through the ‘Bluetooth’ technology installed in his mouth.”).

. See id. at 25 ("Mr. Panetti said that he hears voices. When he hears them, he reads the Gospel to keep the voices from overwhelming him.").

. See id. at 28 (stating that Panetti told counsel that “CNN aired a report in which Wolf Blitzer displayed Mr. Panetti’s TDCJ ID card, which had been stolen from him.”).

. See id. ("Mr. Panetti said that ... [h]e is the father of the actress Selena Gomez.”).

. Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 9-10 (W.D. Tex. Nov. 26, 2014).

. Id. at 10 (alterations in original).

. Panetti v. Quarterman, No. A-04-CA-042SS, 2008 WL 2338498 (W.D. Tex. Mar. 26, 2008).

. Id, at *5 (alterations in original).

. Id. at *6 (citation omitted),

. Id. at *11 (citation omitted).

. Id. at *13 (alterations in original).

. Id.

. Id.

. Id. (citation omitted).

. Id. at *17.

. Id. at *20.

. Id. at *21.

. Id. at *22.

. Id. at *2.

. Id.

. Id.

. Id.

. Id. at *37.

. Brown v. Stephens, 762 F.3d 454, 459 (5th Cir. 2014) (quoting Smith v. Dretke, 422 F.3d 269, 288 (5th Cir. 2005)).

. Panetti v. Quarterman, 551 U.S. 930, 934, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

. Green v. Thaler, 699 F.3d 404, 421-22 (5th Cir. 2012) (OWEN, J., concurring).

. Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

. 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986),

. Id. at 417, 106 S.Ct. 2595.

. Id. at 429, 106 S.Ct. 2595 (O'Connor, J., concurring in part and dissenting in part) (citation omitted).

. Id. at 435, 106 S.Ct. 2595 (Rehnquist, J., dissenting).

. See Panetti v. Quarterman, 551 U.S. 930, 949, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (citing Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)).

. Id. at 949, 127 S.Ct. 2842 (quoting Ford, 477 U.S. at 426, 424, 106 S.Ct. 2595 (Powell, J., concurring)).

. Id. (citation omitted) (quoting Ford, 477 U.S. at 424, 427, 106 S.Ct. 2595 (Powell, J., concurring)).

. Id. (quoting Ford, 477 U.S. at 426, 106 S.Ct. 2595 (Powell, J., concurring)).

. Panetti v. Stephens, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

. Panetti v. Stephens, 727 F.3d 398, 406 (5th Cir. 2013) (alteration in original) (footnotes omitted); see also Panetti v. Quarterman, No. A-04-CA-042-SS, 2008 WL 2338498 (W.D. Tex. Mar. 26, 2008).